## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS,
## EASTERN DIVISION

KEITH WALKER,

              Plaintiff,

    v.

ADMINISTRATOR OF THE ESTATE OF
FORMER CHICAGO POLICE DEPARTMENT
COMMANDER JON BURGE, DANIEL
MCWEENY, JOHN HALLORAN, ANTHONY
MASLANKA, WILLIAM MOSER, LOUIS
CAESAR, SUSAN MCCANN as SPECIAL
REPRESENTATIVE for JOHN MCCANN,
THOMAS BRANKIN, ROBERT LANE, GERI
LYNN YANOW as SPECIAL
REPRESENTATIVE for NICK CRESCENZO,
GERI LYNN YANOW as SPECIAL
REPRESENTATIVE for CRAIG CEGIELSKI,
JOHN SMITH, Star # 3023, DAVID
GOLUBIAK, J. GRIFFIN, Star # 10370,
SERGEANT JOHN BYRNE, SERGEANT
DORIS BYRD, ANTHONY SCHUMANN as
SPECIAL REPRESENTATIVE for
SUPERINTENDENT LEROY MARTIN, and
UNKNOWN EMPLOYEES OF THE CITY OF
CHICAGO, NICHOLAS FORD, MICHELLE
MCDOWELL SIMMONS, the CITY OF
CHICAGO, and the COUNTY OF COOK.

Defendants.

Case No. 21-CV-4231

**JURY TRIAL DEMANDED**

## FOURTH AMENDED COMPLAINT

Plaintiff KEITH WALKER, by his attorneys, Loevy & Loevy, complains of

Defendants Administrator of the Estate of Former Chicago Police Department

Commander JON BURGE; Former CPD DETECTIVE DANIEL MCWEENY, Star #

14367, Former CPD DETECTIVE JOHN HALLORAN, Star # 17429, Former CPD

DETECTIVE ANTHONY MASLANKA, Star # 16161, Former CPD DETECTIVE WILLIAM MOSER, Star # 5056, Former CPD DETECTIVE LOUIS CAESAR, Star # 7208, SUSAN MCCANN as SPECIAL REPRESENTATIVE for former CPD DETECTIVE JOHN (aka JACK) MCCANN, Star # 8137, Former CPD DETECTIVE THOMAS BRANKIN, Star # 12403, Former CPD DETECTIVE ROBERT LANE, Star # 12874, GERI LYNN YANOW as SPECIAL REPRESENTATIVE for Former CPD DETECTIVE NICK CRESCENZO, Star # 3620, GERI LYNN YANOW as SPECIAL REPRESENTATIVE for Former CPD DETECTIVE CRAIG CEGIELSKI, Star # 14238, Former CPD DETECTIVE JOHN SMITH, Star # 3023, Former CPD DETECTIVE DAVID GOLUBIAK, Former CPD DETECTIVE J. GRIFFIN, Star # 10370, ANTHONY SCHUMANN as SPECIAL REPRESENTATIVE for Former CPD SUPERINTENDENT LEROY MARTIN[1], Former CPD SERGEANT JOHN BYRNE, Former CPD SERGEANT DORIS BYRD, Star # 920 and UNKNOWN EMPLOYEES OF THE CITY OF CHICAGO, NICHOLAS FORD, MICHELLE MCDOWELL SIMMONS, the CITY OF CHICAGO, and the COUNTY OF COOK, and states as follows:

## INTRODUCTION

1.     Plaintiff, Keith Walker, is an innocent man who spent nearly three decades imprisoned for crimes he did not commit.

---

[1] On February 16, 2022, the Court granted Plaintiff's unopposed motion to appoint and substitute special representatives for defendants John McCann, Nick Crescenzo, Craig Cegielski, and Leroy Martin. Dkt. 80.

2

2. Like countless others, Mr. Walker's odyssey through a corrupt criminal justice system was instigated by a racist Chicago Police Department that too often treats Black and Brown men and women as nothing more than collateral damage in pursuit of its own agenda.

3. In July 1991, 23-year-old Keith Walker was forced to confess to the murder of Shawn Wicks, a crime he had nothing to do with. Wicks—a white suburban teenager in a black South Side neighborhood of Chicago—was the unfortunate victim of a robbery that has gone unsolved to this day. Not a single piece of physical evidence ever connected Walker to the crime.

4. Walker's false confession to Wicks's murder, like many other false confessions obtained in the City of Chicago, was the product of abuse by police detectives working under now-infamous Commander Jon Burge.

5. Defendant Burge, along with Defendants Daniel McWeeny, John Halloran, Anthony Maslanka, William Moser, Louis Caesar, John (aka Jack) McCann, Thomas Brankin, Robert Lane, Nicholas Crescenzo, Craig Cegielski, John Smith, David Golubiak, J. Griffin, and others, physically and psychologically abused Walker and held him for days.

6. Defendants tortured Walker, threatened to kill him, called him racial slurs, and overwhelmed his will.

7. Defendants' interrogation of Walker was an example of an established practice in the City of Chicago—the false confession capital of the United States— used to secure involuntary incriminating statements from innocent criminal

3

suspects through the use of illegal tactics.

8.  After he suffered prolonged physical and psychological abuse over the course of days, Walker, fearing for his life, signed a false confession implicating himself in crimes he did not commit.

9.  Walker's false confession led to his wrongful conviction and 29 years in prison before he was finally exonerated.

10.  In addition, Walker's wrongful conviction was caused by the egregious misconduct of the Defendant Chicago Police officers and Cook County Prosecutors, who fabricated and suppressed evidence in order to secure Walker's arrest, prosecution, and conviction.

11.  After nearly three decades fighting for his freedom, having spent well over half his life in prison Walker was finally exonerated in 2020.

12.  Walker's wrongful conviction is not an isolated occurrence. Rather, it is part of patterns and practices of systemic torture and physical abuse of Black citizens at the Area 2 and Area 3 Police Headquarters under Defendant Jon Burge's command and supervision.

13.  Plaintiff's torture, wrongful prosecutions and false imprisonment occurred and continued because command personnel in the Chicago Police Department (hereinafter "CPD"), successive Superintendents of Police and several Mayors of the City of Chicago, most notably former Mayor Richard M. Daley, as well as Cook County, its State's Attorney, and its State's Attorneys' Office, all concealed and suppressed their knowledge of ongoing torture and physical abuse

under Burge, blocked and undercut all efforts to expose, discipline, and prosecute offending officers, and refused to intervene to stop the continuing egregious and criminally unconstitutional misconduct.

14. Although Walker will never get the nearly 30 years of his life back and therefore will never be made whole, he now seeks justice for the harm Defendants have caused and redress for the loss of liberty and the terrible hardship he has suffered.

## JURISDCTION AND VENUE

15. Walker brings this action pursuant to 42 U.S.C. § 1983 and Illinois law to redress Defendants' tortious conduct and the deprivation under color of law of his rights secured by the United States Constitution.

16. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and § 1367.

17. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district and the events and omissions giving rise to his claims occurred here.

## PARTIES

18. Plaintiff Keith Walker is a 54-year-old Black man, a citizen of the United States, and resident of the State of Illinois. Keith Walker was born Brian Keith Hall but has long been known by his middle name, "Keith," and by his mother's last name, "Walker." He spent 29 years of his 54 years imprisoned for a murder he did not commit.

19. Jon Burge, who is deceased and therefore sued by and through his estate, was a duly appointed and sworn Chicago Police Lieutenant and was, from

1982 to August of 1986, the commanding officer of Chicago Police Area 2 Detective Violent Crimes Unit. In 1988, Burge was appointed Commander of Area 3 Detective Division and held this assignment until November of 1991, when he was suspended and, ultimately, fired by the CPD for the torture and abuse of another African American man named Andrew Wilson. Defendant Burge engaged in a pattern and practice of torture and brutality himself, and also supervised, encouraged, sanctioned, condoned and ratified brutality and torture by other detectives and supervisors, including, but not limited to, the Police Officer Defendants named herein. Defendant Burge, who was the supervising Lieutenant, inter alia, of Defendants McWeeny, Halloran, Maslanka, Moser, Caesar, McCann, Brankin, Lane, Crescenzo, Cegielski, Smith, Golubiak, Griffin, Byrne, and Byrd on, before, and after June of 1991, was, on June 28, 2010, convicted of perjury and obstruction of justice for falsely denying that he participated in, was aware of, and supervised police torture. Burge engaged in the conduct complained of in the course and scope of his employment, and is sued, through his estate, in his individual capacity. Burge died in 2018. The Administrator of the Estate of Jon Burge is sued as successor in interest to Jon Burge.

20.     At all times relevant to the events described in this complaint, Defendants McWeeny, Halloran, Maslanka, Moser, Caesar, Brankin, Lane, Smith, Golubiak, Griffin, Byrne, and Byrd, along with deceased Defendants McCann, Crescenzo, Cegielski, and Martin were police officers employed by the Chicago Police Department and the City of Chicago. They engaged in the conduct

6

complained of herein in the course and scope of their employment and are sued in their individual capacity. These Defendants, like Defendant Burge, engaged in patterns and practices of torture and brutality as alleged herein.

21.     Collectively, Defendants Burge, Byrne, McWeeny, Halloran, Maslanka, Moser, Caesar, Brankin, Lane, Smith, Golubiak, and Griffin, along with Mr. McCann, Mr. Crescenzo, and Mr. Cegielski, are known as the "Police Officer Defendants."[2]

22.     Collectively, Defendants Burge, Byrne, Byrd, along with Mr. Martin, are known as the "Supervisory Defendants."[3]

23.     Defendant City of Chicago is a municipal corporation that is or was the employer of the above-named defendants. Each of the individually named Police Officer Defendants, Supervisory Defendants, and Defendant Jon Burge acted during their investigation of the Wicks murder as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. Additionally, the City of Chicago is responsible for the policies and practices of the Chicago Police Department.

24.     Defendants Nicholas Ford and Michelle McDowell Simmons were Assistant Cook County State's Attorneys in the Felony Review Division in 1991. They engaged in the conduct complained of in the course and scope of their employment and are sued in their individual capacity.

---

[2] The collective "Defendants" refers to all individual defendants, including Mr. McCann, Mr. Crescenzo, and Mr. Cegielski,
[3] The collective "Defendants" also includes Mr. Martin.

25.     Collectively, Defendants Ford and McDowell are known as the "CCSAO Defendants."

26.     Defendant Cook County is a governmental entity within the State of Illinois, which consists in part of its CCSAO and the Cook County Board. At certain times relevant to this action, Cook County was the employer of Defendants Ford and McDowell Simmons and is therefore a necessary party to this lawsuit.

27.     Each and every individual Defendant, known and unknown, acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

## FACTS

## The Crime

28.     On June 3, 1991, at approximately 2:00 a.m., Shawn Wicks was shot multiple times during a robbery on Chicago's southeast side.

29.     Wicks was attempting to buy marijuana on the street near the intersection of 52nd and Laflin when he was confronted by someone with a gun intent on robbing Wicks of his drug money.

30.     Wicks had traveled to this location with a man he knew named Marcus Bell.

31.     Prior to the attempted robbery and shooting, Wicks and Bell, along with several other friends had all been hanging out together at Bell's apartment at 52nd and Justine in Chicago, drinking and smoking marijuana.

32.     Wicks and Bell had left the apartment to purchase marijuana earlier in the evening, returned, and then smoked the marijuana.

33.     At some point in the evening, Wicks and Bell decided to venture out a second time to purchase more marijuana.

34.     The men traveled around the neighborhood attempting to locate some someone who would sell them marijuana.

35.     Eventually, the men encountered someone who they believed to be a drug dealer.

36.     During the attempted drug transaction, an unknown perpetrator pulled a gun on Wicks and demanded his money.

37.     According to Marcus Bell, Wicks refused to turn over his money.

38.     The individual with the gun opened fire, shooting Wicks multiple times.

### The Police Investigation

39.     Responding officers found Wicks lying on the ground suffering from gunshot wounds. They were unable to get any information from him.

40.     After the paramedics arrived, Wicks told an ambulance driver that he went to a party and then to Laflin Street because he knew he could get drugs there.

41.     Wicks did not offer any details about the perpetrator or the circumstances of his shooting to paramedics.

42.     Defendant Byrne assigned Defendants McWeeny, Brankin, Lane, and other Chicago police officers to the investigation.

9

43.     Defendant Byrd was the supervising police officer on scene. The other Police Officer Defendants reported to Defendant Byrd, followed her directions, and kept her apprised of investigative leads.

44.     At the scene, among other things, Police interviewed Bell and several of Wicks's other friends. In addition, they interviewed numerous witnesses.

45.      Multiple witnesses independently provided Defendants, including Defendants Bryd, McWeeny, Brankin, Lane, and others, information that exculpated Walker. Some of these witnesses provided information that other individuals who were not Walker had perpetrated the crime. This information was known to the Defendants just named, and it was suppressed.

46.     Defendants McWeeny, McCann, and Caesar detained Bell.

**Police Officer Defendants Falsely Arrest Walker**

47.     In early June 1991, Walker was walking out of a convenience store when Defendants McWeeny, McCann, Caesar, Halloran, and others detained Walker.

48.     Defendants were wearing plainclothes when they approached Walker.

49.     Defendants approached Walker with their guns drawn.

50.     One of the Defendants grabbed Walker, threw him onto the ground, and handcuffed him.

51.     Defendants searched Walker but found no evidence of any crime.

52.     Nevertheless, Police Officer Defendants detained Walker and put him into the back of one of the cars.

53.     Police Officer Defendants never informed Walker of his *Miranda* rights or explained to him why he was being arrested.

54.     Police Officer Defendants took Walker to the Area 3 Detective Headquarters, where Jon Burge was Commander.

**Defendants Interrogate Walker for Days**

55.     At Area 3, Police Officer Defendants first locked Walker in a cage. They next moved him to an interrogation room.

56.     As soon as Walker was brought into the interrogation room, one of the Defendants slammed him against the wall of the room.

57.     Defendants handcuffed Walker to the wall.

58.     Multiple Defendants repeatedly struck Walker.

59.     Walker pleaded with Defendants to stop. He began to cry and begged for mercy.

60.     Walker was not allowed to call his attorney.

61.     Walker was not read his *Miranda* rights.

62.     Despite asking several times, Walker was not initially told why he had been arrested.

63.     At various times, Defendants Burge, McWeeny, Caesar, Halloran, McCann, Maslanka, and others entered the room where Walker was being held.

64.     Defendant McWeeny eventually accused Walker of shooting someone.

65.     Other Defendants also told Walker that they knew he had shot someone and that they had someone at the police station who had implicated

Walker.

66.     Walker continuously denied any knowledge of the shooting.

67.     Defendants then began a regime of physical and psychological torture that would last for days.

68.     Walker continued to deny any involvement in any shooting and continued to ask for a lawyer.

69.     Defendant McWeeny repeatedly attempted to get Walker to sign documents.

70.     Walker told Defendant McWeeny that he was innocent and that he could not read the documents.

71.     Defendants repeatedly called Walker "n****r" and "boy," and insulted him by telling him that he was "stupid," "dumb," and "retarded."

72.     Defendants told Walker that if he continued to refuse to sign a statement, he would never go home again, that he would never see his family again, and that he was going to get the death penalty.

73.     During the interrogation, Defendants Burge, McWeeny, Halloran, and other defendants brought a Chicago Police evidence technician into the room and administered what Defendants referred to as a "gun test." The evidence tech used a swab and a solution which he wiped all over Walker's fingers and hands. Walker asked what the test was, and the technician responded that it was a test to determine whether Walker had fired a gun.

74.     At the end of the test, the technician indicated to Defendants that the

test was negative, and that there was no indication that Walker had fired a weapon.

75.    Defendants ordered the evidence technician to leave the room.

76.    For several days, Police Officer Defendants including Burge, McWeeny, Caesar, Maslanka, and others continued to interrogate Walker about the June 3 murder of Wicks.

77.    These Defendants tortured Walker, attacking him, kicking him, delivering blows to his head, choking him, and administering electrical shocks, among other illegal acts of physical violence.

78.    In addition to the extreme physical abuse and threats that Walker would be executed if he did not cooperate, Defendants kept Plaintiff handcuffed to the wall during the interrogation, reinforcing their total control and authority over him.

79.    They also intentionally deprived Plaintiff of sleep throughout the interrogation. Defendants kept him awake and handcuffed to the wall in a windowless interview room during his days-long interrogation. By the time Plaintiff's interrogation came to an end, Plaintiff had not slept since arriving at the police station.

80.    The enforced sleep deprivation heightened the already impermissibly coercive nature of the interrogation.

81.    Defendants repeatedly and strenuously accused Plaintiff of the Wicks murder over the course of the interrogation. Defendants screamed at Plaintiff

13

repeatedly that he was guilty, often within inches of his face, in order to deliberately intimidate and frighten Plaintiff.

82. For most of the interrogation, the room in which the interrogation took place was closed and locked, without any windows.

83. Defendants also failed to give Plaintiff any effective Miranda warnings. At no point did Plaintiff knowingly or voluntarily waive his right to remain silent or his right to have counsel present at the interrogation.

84. In the face of the extreme physical and psychological abuse and coercion described above, Plaintiff steadfastly maintained his innocence. Plaintiff told the Police Officer Defendants over and over that he did not know anything about the crime and that he was not involved in any way in the Wicks murder. The Defendants ignored Plaintiff and brushed to the side evidence that corroborated Plaintiff's claims of innocence.

85. In response to Walker denying his involvement in the shooting, Defendants, including Defendant Burge, continued to abuse Walker physically and psychologically, in order to coerce Walker into falsely confessing to involvement in the Wicks murder.

86. Defendants repeatedly attacked Walker whenever he denied his involvement.

87. Walker legitimately feared that Defendants might kill him.

88. At some point, Defendants left the room and returned with a small device. They used this device to repeatedly electrocute Walker. The electric

14

shocks were administered by a black, make-shift device with a crank on the side. It was placed on Walker's arm and used repeatedly to electrocute him.

89. The electrical shocks were administered multiple times over the course of days.

90. At one point, one of the Defendants pointed a gun at Walker's head and threatened to kill him.

91. Walker begged Defendants to stop beating and shocking him and he truthfully told Police Officer Defendants he did not commit, or witness Wicks any shooting.

92. Defendants, including McWeeny, falsely told Walker that they found evidence connecting him to the Wicks shooting.

93. Ultimately, Defendants overcame Walker's will and caused him to confess falsely to the Wicks shooting.

94. Each Police Officer Defendant participated in the coercion that led to his false statement.

95. As described in greater detail below, Defendants employed the same or similar torture and tactics on three other men they had in custody in addition to Walker, including Marcus Bell.

96. Defendants did not disclose they had used those tactics, and they obtained false statements from these other men that were used to implicate Walker in the Wicks shooting.

97. Each Supervisory Defendant, except for Defendant Martin, was present at some point during the interrogations of Walker, his eventual co-defendants and/or witnesses that resulted in his false statement.

98. Each of the Supervisory Defendants had prior notice of the abusive and coercive practices of the Police Officers Defendants and did nothing to stop it during other interrogations or during the Walker interrogations.

## Defendants Fabricate a Deathbed Identification

99. In furtherance of the conspiracy to frame Walker, Defendants, including Defendant McWeeny, fabricated a police report stating that, Wicks identified Walker as the person who shot him during a photo array conducted at Cook County hospital.

100. At the time of the purported identification, Wicks had undergone multiple surgeries, was intubated, was unable to speak, and was under the influence of sedatives.

101. Defendant McWeeny falsely claimed that because Wicks was unable to speak, he established a hand squeezing system whereby he showed Wicks a series of photos and Wicks identified Walker.

102. In reality, the identification never occurred and was wholly fabricated.

103. In addition, the photo array consisted of Polaroids of three suspects and Walker, which were in color, as well as allegedly other "filler photographs," which were black and white.

16

104.   Accordingly, even if the photo array had resulted in an identification, the array was unduly suggestive.

105.   Wicks died from his wounds on June 10, 1991, shortly after the purported identification occurred.

106.   Following McWeeny's alleged photo array identification, Defendant Simmons was summoned to Wicks's hospital room where she met with Defendant McWeeny.

107.   Defendant Simmons falsely claimed that because Wicks was unable to speak, she established an eye blinking system whereby she showed Wicks Polaroids of Walker and his co-defendants, and that Wicks had identified Walker.

108.   Again, at the time of Simmons's purported identification, Wicks was intubated, was unable to speak, and was under the influence of sedatives.

109.   Again, the photo array was unduly suggestive.

**As an Act of Survival, Walker Escapes Police Custody**

110.   At some point, after days of interrogation and torture, Walker was left alone in the interrogation room, handcuffed to a bench.

111.   Walker observed that the interrogation room had dried blood stains on the floor and furniture.

112.   Terrified that he was not going to make it out of that room alive, Walker managed to slide his hand out of the handcuff.

113.   The door of the room that Walker was in was unlocked.

114. After enduring multiple days of torture, Walker, fearing that the Defendants were going to eventually kill him, decided to try to escape.

115. Walker left the room he was in, proceeded down the stairs, and out the front door of the police station.

116. After his escape, Walker hid from the police, in fear for his life.

### Defendants Torture Marcus Bell and Tyshawn Ross into Implicating Walker and Suppress Their Misconduct

117. While Defendants were interrogating Walker, they were also interrogating and torturing Marcus Bell and Tyshawn Ross.

118. As with Walker, Police Officer Defendants used physical and psychological abuse to coerce Bell and Ross into signing statements falsely implicating Walker in the Wicks shooting.

119. Defendants beat and threatened Bell. They repeatedly struck him until vomited on himself.

120. Bell asked for a lawyer, but Defendants refused his requests.

121. Defendants cuffed him to the wall and laughed at him while he cried and urinated and defecated on himself while handcuffed to the wall.

122. Bell was also given a "gun test" and subjected to a polygraph examination. Both tests were negative.

123. Eventually, Bell's will was overwhelmed, and he agreed to sign a confession implicating Walker as the person who shot Wicks and himself as an accomplice to the shooting.

124. The statement contained the same fabricated account of a botched plan

18

to rob Wicks that was set out in Walker's fabricated statement.

125.    The information in Bell's statement implicating Walker was made up and fed to Bell by Defendants, including Defendant Caesar.

126.    Defendants also beat and threatened Ross. When Ross continued to deny any knowledge or involvement in the shooting, Defendants attached the black electrical device to his testicles and repeatedly electrocuted him.

127.    Just like Bell, Ross ultimately signed a false statement implicating Walker in the shooting of Wicks after being tortured by Defendants.

128.    The information in Bell's statement implicating Walker was made up and fed to Bell by Police Officer Defendants, including McCann.

**Defendants Coerce Walker into Signing a False Confession**

129.    Walker was eventually arrested, taken into custody, and interrogated by Defendants again.

130.    Walker was again locked in an interrogation room.

131.    Terrified from the prior physical and emotional torture and abuse he had experienced, Walker suffered a complete and immediate psychological collapse.

132.    This time, Defendants Golubiak and Griffin entered the interrogation room, joined later by Defendant Ford.

133.    Walker did not know Defendant Ford was a Cook County State's Attorney because Ford never introduced himself as such to Walker.

134.    Defendants Golubiak, Griffin, and Ford told Walker that Bell and Ross had implicated him in the Wicks murder.

135.   Walker again told the Defendants that he had nothing to do with the Wicks shooting.

136.   Defendants told him that they knew what had happened to him when he was in custody a month prior and that if he refused to sign the confession, Defendants would resume their torture of him.

137.   Defendants furthermore told Walker that if refused to sign a confession, they would make certain he eventually got the death penalty.

138.   Defendant Ford told Walker that he would never see his family again if he did not cooperate.

139.   Walker was in such fear for his life that he agreed to sign whatever the Defendants told him to in order to avoid further torture.

140.   Defendants Golubiak and Griffin, in concert with Defendant Ford, presented Walker with a handwritten confession.

141.   The statement presented to Walker was already written out.

142.   Defendants Golubiak, Griffin, and Ford pressured Walker to sign it, making clear to him that if he refused, he would be tortured again.

143.   Walker signed the handwritten confession but never read it.

144.   The facts in the statement were entirely fabricated by Defendants, including Defendant Ford.

145.   Walker's confession was signed at 2:45 a.m. on July 3, 1991.

146.   Each Defendant Officer was present at some point during Walker's interrogations and participated in the coercion that resulted in his false statement.

147.    At all times, Police Officer Defendants knew Walker had no involvement in the Wicks shooting.

148.    Only after signing the confession, and on the basis of that confession and the statements of Bell, Ross, and eventually another man named Yusef Trice, Walker was charged with murder for the Wicks shooting.

**Police Officer Defendants Torture Yusef Trice into Implicating Walker**

149.    Then months later, in September 1991, Defendants detained Yusef Trice.

150.    When Trice denied any knowledge or involvement in the shooting, Defendants beat and threatened Trice.

151.    Just like Bell and Ross before him, Trice also signed a false statement implicating Walker in the shooting of Wicks after being tortured by Defendants.

152.    The information in Trice's statement implicating Walker was made up and fed to Trice by Police Officer Defendants including McWeeny.

**Plaintiff's Wrongful Prosecution and Conviction**

153.    The Police Officer Defendants fabricated police reports to cover up their misconduct, and they provided those false reports to state prosecutors.

154.    The Police Officer Defendants' reports and fabricated statements became the basis for charging and prosecuting Walker.

155.    Among other things, the Police Officer Defendants suppressed all information about the coercive tactics they had used on Walker, including the

torture, psychological abuse and threats, the fabricated co-defendant witness statements, and their fabrication of Wicks's identification.

156.    The Police Officer Defendants also suppressed exculpatory information that would have exonerated Walker.

157.    The Supervisory Defendants failed to intervene and/ or condoned the Police Officer Defendants' abuse, fabrication of evidence, and/or suppression of evidence during the Wicks shooting investigation.

158.    As a result of Defendants' misconduct and based on the false evidence described in this complaint, Walker was prosecuted for the shooting death of Shawn Wicks.

159.    The Police Officer Defendants hid their fabrication of evidence from prosecutors and from Walker's defense before his trial, and they suppressed all evidence that exonerated Walker.

160.    The Police Officer Defendants gave false statements to state prosecutors, and Defendants McWeeny, Caesar, McCann provided false testimony during Walker's criminal proceedings.

161.    The only evidence introduced at Walker's trial implicating him in the murder was the material the Police Officer Defendants fabricated and coerced.

162.    Because of the Police Officer Defendants false and manufactured evidence, Walker was wrongfully convicted and sentenced to life in prison.

163.    Walker was 23 years old at the time Defendants framed, tortured, and coerced him to confess to a crime for which he was completely innocent.

22

## Plaintiff's Long Road to Exoneration

164.    After his conviction, Plaintiff fought hard to prove his innocence.

165.    One of his Walker's attempts to seek justice was derailed by one of the very people who conspired to frame him in the first place.

166.    In March of 2004, Walker submitted a *pro se* post-conviction petition alleging that he was beaten, and his confession was coerced.

167.    Inexplicably, on April 20, 2004, then-judge Defendant Ford summarily dismissed Walker's petition, stating "In total it is my view that this petition for post-conviction relief is patently frivolous and without merit and will be dismissed in accordance without finding."

168.    On appeal the Illinois Appellate Court recognized Ford's prior involvement in the case and vacated Judge Ford's summary dismissal and remanded the case for further proceedings under Illinois' Post-Conviction Hearing Act.

169.    After Walker's case was returned to the trial court, Judge Ford finally recused himself.

170.    Eventually in 2008, Walker filed an amended post-conviction petition, detailing Police Officer Defendants' abuse during his interrogation. By this time, Jon Burge and his progeny had risen to notoriety for coercing false confessions from innocent, young, Black boys and men using physical and psychological abuse.

171.    Before going to hearing, in August 2020, the Attorney General's Office moved to vacate Walker's conviction and dismiss all charges against him.

23

172.    On August 13, 2020, after nearly 30 years in prison, 52-year-old Keith Walker was finally a free man again.

**Policy and Practice of Wrongly Convicting Innocent Individuals**

173.    The Chicago Police Department is responsible, by virtue of its official policies, for inflicting miscarriages of justice in scores of incidents like the one Walker endured.

174.    Since 1986, at least 150 cases have come to light in which Chicago police officers fabricated false evidence or suppressed exculpatory evidence to cause the convictions of an innocent person for serious crimes he did not commit.

175.    These cases include many in which Chicago police officers used the same tactics Defendants employed against Plaintiff in this case, including fabricating evidence, concealing exculpatory evidence, manipulating eyewitness identifications and testimony, and using other tactics to secure the arrest, prosecution, and conviction without probable cause and without regard for the person's actual guilt or innocence.

176.    As early as November of 1990, the Chicago Police Department's Office of Professional Standards acknowledged, in its "Goldston Report," that "abuse did occur and that it was systematic" at Area 2.

177.    The Goldston Report, which was prepared by OPS investigator Michael Goldston, found that there was systematic abuse of suspects held in custody at Area 2 and that Area 2 command personnel were aware of the systematic abuse and encouraged it by actively participating or failing to take action to stop it.

178. In 1991, the Goldston Report was supplemented with a finding that Defendants Burge and others were among the prime movers in this pattern of abuse.

179. In a companion Report (the Sanders Report) the OPS found that Defendants Burge and others tortured a man named Andrew Wilson and recommended that all three be fired.

180. The CPD's policy and practice of misconduct was recently further described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, among other things, that in the 1990s Chicago police detectives fed information to witnesses and coached them through court-reported and handwritten statements, coerced witnesses into sticking to a detective's theory of the case, physically abused witnesses, and worked together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

181. At all relevant times, members of the Chicago Police Department, including Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos, and other information. This concealed material was kept in files that were maintained only at the police department and never disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed or hidden at the close of the investigation rather

than being preserved as part of the official file.

182.    Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

183.    The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established in the cases of, *inter alia*, *Rivera v. Guevara*, No. 12 C 4428 (N.D. Ill.), *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, No. 87 C 2536 (N.D. Ill.).

184.    The policies and practices of suppressing exculpatory and/or impeaching evidence at issue in *Rivera*, *Fields*, and *Jones* applied throughout the timeframe from the 1980s through the 2000s, including at the time of the Wicks murder investigation at issue here.

185.    In addition, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago police detectives recommended charging an innocent person with a serious crime, and no Chicago police officer has ever been disciplined as a result of his misconduct in any of those cases.

186.    Before and during the period in which Plaintiff was falsely charged with and convicted of the Wicks murder, the City of Chicago also operated a dysfunctional disciplinary system for Chicago police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the

26

public. Further, the disciplinary apparatus had no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

187.    The U.S. Department of Justice recently issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

188.    On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's supervisory

practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

189.   The DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the Department of Justice found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints were sustained, discipline was inconsistent and unpredictable.

190.   Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority." Between 2004 and 2016, the City recommended disciplinary action in fewer than 4% of cases in which it paid settlements to plaintiffs alleging violation of their civil rights and did not conduct any disciplinary investigations in over half of those cases.

191.   Since before Walker's arrest and continuing for years afterward, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

192.   Charlie Beck, the former interim superintendent of the CPD, recently

28

acknowledged the existence of the CPD's code of silence.

193.   As a result of the City of Chicago's established practices, Police Officer Defendants came to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. The practices that enable this belief include failing to track and identify police officers who are repeatedly accused of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct, and facilitating a code of silence within the Chicago Police Department. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens.

194.   Police Officer Defendants engaged in such misconduct because they had no reason to fear that the City of Chicago and its police department would ever discipline them for doing so.

195.   Several of these Defendants worked in Areas 2 and 3 alongside notorious Chicago Police Detective Burge, whose long history of engaging in the kind of investigative misconduct that occurred in this case, including manipulating eyewitness identifications and fabricating and concealing evidence in the course of maliciously prosecuting innocent persons, is well-known and widely acknowledged.

196.   There are dozens of known cases in which Burge, his partners, his colleagues, and other Chicago police officers engaged in the serious investigative

misconduct described above. They engaged in such misconduct because they had no reason to fear that their supervisors would ever discipline them for doing so.

197.    The City of Chicago and its police department also failed in the years prior to Walker's conviction to provide adequate training to Chicago police detectives and other officers in many areas, including the following:

a.    The conduct of live lineup, photographic, and other identification procedures.

b.    Preserving material evidence, such as photographic arrays used for identification purposes.

c.    The constitutional requirement to preserve and disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

d.    The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

e.    The risks of wrongful conviction and the steps police officers should take to minimize risks.

f.    The risks of engaging in tunnel vision during investigation.

g.    The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as

witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

198.    The need for police officers to be trained in these areas was and remains obvious. The City's failure to train Chicago police officers as alleged in the preceding paragraph caused Walker's wrongful conviction and his injuries.

199.    The City's failure to train, supervise, and discipline its officers, including Defendants Burge, McWeeny, Halloran, Maslanka, Moser, Caesar, McCann, Brankin, Lane, Crescenzo, Cegielski, Smith, Golubiak, Griffin, Martin, Byrne, and Byrd, condones, ratifies, and sanctions the kind of misconduct that the Defendants committed against Walker in this case. Constitutional violations such as those that occurred in this case are encouraged and facilitated as a result of the City's practices and de facto polices, as alleged above.

200.    The City of Chicago and final policymaking officials within the Chicago Police Department failed to act to remedy the patterns of abuse described in the preceding paragraphs, despite actual knowledge of the pattern of misconduct. They thereby perpetuated the unlawful practices and ensured that no action would be taken (independent of the judicial process) to remedy Plaintiff's ongoing injuries.

201.    The policies and practices described in the foregoing paragraphs were also approved the City of Chicago policymakers, who were deliberately indifferent to the violations of constitutional rights described herein.

### Defendant Martin's Failure to Intervene and Concealment of Exculpatory Evidence

202.    In 1987, Defendant Martin was named Superintendent of the CPD.

31

203.    Prior to becoming Superintendent of Police, Defendant Martin had been Commander of Area 2 in 1983 and Defendant Burge's direct supervisor.

204.    At that time, Defendant Martin learned that Defendant Burge and detectives under his command systematically tortured and abused numerous African American suspects, including the Jackie and Andrew Wilson, Eric Smith, Alonzo Smith, James Andrews, Jerry Mahaffey, Reginald Mahaffey, Gregory Banks, David Bates, Darrell Cannon, James Cody and Leonard Hinton.

205.    Defendant Martin failed to initiate appropriate investigations or to discipline Defendant Burge in connection with any of these cases.

206.    As Superintendent, possessing direct knowledge of Burge's practices from his time as Area 2 commander, Defendant Martin continued to fail to intervene, to supervise, discipline or otherwise act to prevent the ongoing misconduct of Burge and his men.

207.    Instead, Defendant Martin worked actively to conceal and suppress evidence of the pattern of torture, as is fully alleged below.

208.    The actions and inactions of Defendant Martin in refusing and failing to investigate the actions of Defendant Burge and his confederates and in suppressing the exculpatory evidence in his possession proximately caused Plaintiff's wrongful prosecution, conviction, and 29 years of wrongful incarceration for crimes that he did not commit.

209.    Plaintiff's wrongful prosecution was continued, his exoneration was delayed, and his imprisonment and wrongful conviction lasted far longer than they

32

otherwise would have because, for many years, Defendant Martin, in conspiracy with others, including Defendants Burge, Byrne, Byrd, and their police confederates, and successive Police Superintendents and police command personnel, continued to make extraordinary efforts to suppress, conceal, and discredit exculpatory evidence regarding the pattern of torture and physical abuse of African American men by Chicago Police detectives under Burge's command.

210.    Rather than disclose exculpatory material and conduct appropriate investigations, Defendants Martin, and other co-conspirators caused the CPD to actively conceal and suppress information regarding the scope and extent of the torture and abuse of African American suspects that occurred under Burge.

211.    Defendant Martin and other police command personnel delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions set forth above, inter alia, by suppressing evidence of torture and by refusing to suspend, transfer or remove Burge either before, or for nearly a year after, the Goldston Report's findings were first made known to them in November of 1990.

212.    Defendant Martin and other command personnel further delayed, obstructed, and otherwise undermined the OPS investigation, the Goldston Report, and its findings and conclusions set forth above, inter alia, by suppressing the findings that there was systematic abuse at Area 2, which implicated Defendants Burge other Area 2 detectives who worked under Burge's command.

213.    The Goldston Report and its findings were not publicly released until February 7, 1992, when Federal District Judge Milton I. Shadur ordered the Report's release.

214.    Defendant Martin had been the commanding officer at Area 2 and Defendant Burge's direct supervisor during part of the time the Goldston Report found there to be "systematic" torture, and that Defendant Martin therefore had a motive and the intent to suppress and discredit the Goldston Report and its findings.

215.    Even after learning of the findings in the Goldston Report, Defendant Martin and other command personnel, in violation of police regulations, refused to investigate numerous other allegations of police torture that were brought to their attention, including allegations of electric shock and abuse previously made by electric shock victim Melvin Jones against Defendant Burge.

216.    From 1989 to 1992, Defendant Martin, and command subordinates, through several public hearings held by the Chicago City Council and the Chicago Police Board, and a report by Amnesty International, were given additional actual notice that Defendant Burge was the leader of a group of Chicago detectives that systematically tortured and abused African American suspects in order to obtain confessions in murder and other serious felony cases.

217.    In January of 1992, Defendant Martin admitted in a publicly filed pleading that there was an "astounding pattern or plan" on the part of Burge and

34

his confederates "to torture certain suspects, often with substantial criminal records, into confessing to crimes."

218.  In February 1993, the Chicago Police Board fired Defendant Burge for torturing Andrew Wilson.  These findings became final in December 1995.

219.  In 1993 the OPS re-opened investigations into approximately ten Area 2 torture cases.  After exhaustive re-investigations, which uncovered substantial new evidence in support of the allegations, OPS investigators sustained numerous allegations that two of Defendant Burge's self-admitted "right hand men," Defendant Sergeant John Byrne and Detective Peter Dignan, racially abused and tortured Darrell Cannon, Phillip Adkins, Gregory Banks, Thomas Craft, Lee Holmes and Stanley Howard.

220.  From 1993 until 1998, OPS suppressed these findings and the evidence.

221.  In 1998, the City of Chicago, with full knowledge that Defendant Byrne and Dignan, together with Defendants Burge and other Area 2 and Area 3 detectives, participated in a pattern and practice of torture and abuse of suspects, including Plaintiff, violated police regulations and obstructed justice by overturning the OPS sustained findings in the six re-opened cases set forth above; by refusing to investigate other torture victims' claims that they had been tortured; by refusing to investigate the OPS suppression of evidence; and by suppressing these OPS files and findings from Plaintiff and other criminal defendants.

### The Police Officer Defendants' Pattern of Misconduct that Extended to Mr. Walker

222.   In addition, Police Officer Defendants' abuse and coercion in investigating the June 3, 1991 shooting was not an isolated incident. On the contrary, each individual Defendant engaged in a pattern of similar misconduct that extended to Walker and continued after his interrogation.

223.   Before Walker's interrogation, McWeeny, for example, coerced confessions from countless innocent people using the same methods he applied to Walker.

224.   McWeeny has invoked his Fifth Amendment privilege against self-incrimination when asked to testify about his interrogations of suspects.

225.   Furthermore, the 2006 report on the torture victims of Jon Burge by Special Prosecutors Edward Egan and Robert Boyle (the "Egan Report") documented numerous abuses perpetrated by Defendants Maslanka, McWeeny, and others in the 1980s and 90s. The report includes allegations that officers beat and threatened arrestees into confession, hit them with objects including guns, phones, flashlights, cords, nightsticks, fists and feet, kept them awake until they signed confessions, electrocuted them, repeatedly called arrestees "n*****s" and conducted lineups of juvenile suspects without notifying their parents.

226.   Regarding Defendant Maslanka, the Report concluded beyond a reasonable doubt that a suspect he was interrogating—Alfred Pinex—soiled himself as a result of Maslanka's physical abuse, and that Maslanka perjured himself when he testified at Pinex's sentencing hearing. *See* Egan & Boyle, Report of the Special

36

State's Attorney, at Volume C, 275-90.

227.   Likewise, The Illinois First District Appellate Court has found that "[n]umerous officers under the command of Burge, including officer [] . . . McWeeney [sic], have been implicated in many . . . instances of physical abuse."

228.   The Illinois Supreme Court in *People v. Patterson*, 192 Ill. 2d 93 (2000), for example, cited "[e]ight cases involv[ing] McWeeny, who was usually identified as an officer who appeared to take a statement from the victim after the torture had been completed." Indeed, courts have described McWeeny as taking on the "good cop" role in interrogations."

229.   Another man, Cortez Brown, was freed from prison after a post-conviction hearing at which Defendant Maslanka asserted his Fifth Amendment right to silence rather than testify about their interrogation of Brown, on grounds that truthful statements could implicate them in a crime.

230.   Likewise, Defendant McWeeny played a role in all four pardons based on innocence granted by Governor Ryan in 2003.

231.   Defendant McWeeny was also implicated in at least 11 cases of abuse as established by the 2007 follow-up "Report on the Failure of Special Prosecutors Edward J. Egan and Robert D. Boyle to Fairly Investigate Police Torture in Chicago."

232.   In addition, McWeeny is mentioned in the Report as a participant in the beating of Madison Hobley and playing a role in the torture of Stanley Howard and Aaron Patterson.

233.    The Report also concluded that Melvin Jones was telling the truth about his claim of torture during an investigation in which McWeeny was involved.

234.    Further, in 2007, Cook County Judge Sumner pointed to "evidence presented by petitioner [James Andrews], which includes an OPS report, Appellate and Supreme Court opinions regarding the systematic brutality at Area 2, other incidences of torture at Area 2, and in particular at the hands of Detective McWeeny" in vacating Andrews' conviction based on the detectives' wrongdoing.

235.    Moreover, TIRC has referred to Defendant McWeeny as a "well-known Burge subordinate." As of July 25, 2013, TIRC noted that "McWeeny has been accused in 14 other cases of abuse and coercion of suspects in police custody" in crediting Robert Smith's torture claims.

236.    TIRC also determined in 2017 that Javan Deloney presented "sufficient evidence of torture" by Defendant McWeeny.

237.    Also, in 2017, TIRC unanimously found sufficient credible evidence of torture to merit judicial review regarding Demond Weston's claims that Defendants Moser and Maslanka, and others, abused him and threatened him at the police station until he falsely confessed to a 1990 murder—for which he was later exonerated.

238.    Defendant McWeeny has asserted the Fifth Amendment protection against self-incrimination when questioned about abusing suspects in police custody. For example, McWeeny asserted his Fifth Amendment rights in connection with his participation in Walker's co-defendant, TyShawn Ross' conviction in

38

response to this question: "Did you on or about June 4, 1991, participate in, witness, or otherwise become aware of the arrest, transport, interrogation, beating, threatening, placing a bag over the head of, electric shocking and/or any other physical or psychological abuse of arrestee TyShawn Ross?"

239. Examples of abuses by Police Officer Defendants also include the following, all of which are corroborated by sworn testimony:

a. On November 2, 1983, Defendant McWeeny, Jon Burge, and other CPD detectives tortured Darrell Cannon while interrogating him for the murder of Darrin Ross, a crime he did not commit. McWeeny participated in shoving a cattle prod into Cannon's mouth until he agreed to falsely confess, among other abuse. Defendant McWeeny later perjured himself, denying in court that Cannon was abused.

b. Around September 1987, Defendant McWeeny and others interrogated Robert Smith in connection with a double murder. Defendant McWeeny beat Smith in the chest. Smith falsely confessed to the murder because of McWeeny's and other detectives' abuse. In 2013, TIRC found Smith's claim credible based, in part, on hospital records that substantiated the physical abuse.

c. In June 1989, Defendant McWeeny and others physically and psychologically abused 19-year-old Corey Batchelor and his friend Kevin Bailey until each confessed to a murder of which they were innocent. McWeeny and others punched, kicked, and choked Batchelor;

39

banged his head into a wall; deprived him of sleep; isolated him from family and attorneys; threatened to kill him; and made false promises of leniency over the course of an interrogation that lasted over 24 hours. After Batchelor served more than 15 years in prison, the State dismissed the charges against him and his conviction was vacated.

d. In 1994, Defendant Moser and other officers beat Anthony Williams into falsely confessing to murder and armed robbery.

e. As referenced above, in 1982 Jackie Wilson was tortured by Area Two detectives at the direction and with the participation of Defendant Burge into confessing to the murder of two Chicago police officers. 39 years later on October 1, 2020, a special prosecutor dismissed charges against Wilson and on December 18, 2020, Wilson was granted a Certificate of Innocence by the State of Illinois, officially recognizing him as an innocent man. In granting the certificate, Honorable William H. Hooks found that Wilson had been physically tortured by a brutal electrical box torture ritual.

**The Defendants' Misconduct Was Committed in Furtherance of Conspiracy**

240.    All of the named individual Defendants, acting jointly and with other police and prosecutorial investigative, supervisory, and command personnel, together reached an understanding, engaged in an ongoing course of conduct and joint action and otherwise conspired and continue to conspire among and between themselves to deprive Plaintiff of his constitutional rights.

40

241.   This conspiracy is evidenced, inter alia, by the overt acts set forth above and below, and has continued to the present, as evidenced, inter alia, by the false testimony and statements denying torture by these Defendants and their fellow officers; false statements and testimony that Burge, and various other police and assistant state's attorney co-conspirators gave to the FBI, before the Federal Grand Jury, and/or at trial in *U.S. v Burge*; and by false public statements concerning police torture made by, inter alia, Defendant Burge, and co-conspirators, including those made in July of 2006 in response to the Special Prosecutor's Report, in October of 2008 in response to Burge's indictment, in June and July of 2010 in response to Burge's conviction, and in April and May of 2015 in response to Chicago City Council passing of the Reparations For Burge Torture Victims' Ordinance.

242.   By and through these overt acts, together with those set forth above, each and every Defendant, jointly and in conspiracy, with  a shared understanding, intent, and/or meeting of the minds, deprived, and continues to deprive, Plaintiff of his constitutional rights, including his right to be free from unreasonable arrest, seizure, wrongful confinement, imprisonment, and the excessive use of force; his right to be free from involuntary self-incrimination and from interrogation techniques that "shock the conscience;" his right to access to the courts, to a fair and impartial trial and to be free from wrongful prosecution and conviction; and his right to equal protection of the law, all as protected by the Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

41

**Walker's Damages**

243.    Walker spent 29 years of his life in prison and jail for a crime he did not commit.

244.    For 29 years, Walker was threatened and attacked by guards and inmates, experienced physical injuries, and lived in constant fear for his life.

245.    Walker was repeatedly denied proper medical care during his incarceration.

246.    Additionally, the emotional pain and suffering Defendants' misconduct caused has been, and continues to be, substantial.

247.    Because of Defendants' misconduct, Walker was taken away from, and missed out on, the lives of his family and his friends. Walker was only 23 years old when he was arrested, and later sentenced to natural life without the possibility of parole. He was robbed of opportunities to gain an education, to establish and develop a career, and to pursue his interests and passions.

248.    Walker has been deprived of all the basic pleasures of human experience, which all free people enjoy as a matter of right, including the freedom to live one's life as an autonomous human being.

249.    Walker lived in constant emotional anguish, never knowing whether the truth would come out and whether he would ever be exonerated.

250.    In addition to the severe trauma of wrongful imprisonment and Walker's loss of liberty, Defendants' misconduct continues to cause Walker extreme physical and psychological pain and suffering, humiliation, constant fear,

nightmares, anxiety, depression, despair, rage, and other physical and psychological effects. Walker has also suffered profound and continuing reputational harm as a result of being labeled a murderer.

## COUNT I
### 42 U.S.C. § 1983 – Coerced and False Confession in Violation of the Fifth and Fourteenth Amendments

251.    Plaintiff incorporates each paragraph of this pleading as if fully restated here.

252.    In the manner described more fully above, the Police Officer Defendants and the CCSAO Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, forced Plaintiff to make false statements involuntarily and against his will, which incriminated him and which were used against him in criminal proceedings, in violation of his rights secured by the Fifth and Fourteenth Amendments.

253.    In addition, the Police Officer Defendants and the CCSAO Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used physical violence and extreme psychological coercion in order to force Plaintiff to incriminate himself falsely and against his will in a crime he had not committed, in violation of his right to due process secured by the Fourteenth Amendment. This misconduct was so severe as to

shock the conscience, it was designed to injure Plaintiff, and it was not supported by any conceivable governmental interest.

254. In addition, the Police Officer Defendants and the CCSAO Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, fabricated a false confession, which was attributed to Plaintiff and used against Plaintiff in his criminal proceedings, in violation of Plaintiff's right to a fair trial protected by the Fourteenth Amendment.

255. Specifically, Police Officer Defendants and the CCSAO Defendants conducted, participated in, encouraged, advised, and ordered an unconstitutional, multi-day interrogation of Plaintiff, using physical violence and psychological coercion, which overbore Plaintiff's will and resulting in him making involuntary statements implicating himself in the murder of Shawn Wicks.

256. Those false incriminating statements were wholly fabricated by the Defendants and attributed to Plaintiff.

257. Those false incriminating statements were used against Plaintiff to his detriment throughout his criminal case. They were the reason that Plaintiff was prosecuted and convicted of the Wicks murder.

258. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

259. As a result of Defendants' misconduct described in this Count, Plaintiff

suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

260.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago and the County of Cook.

261.    At all relevant times and before the events giving rise to this lawsuit occurred, the City of Chicago promulgated rules, regulations, policies, and procedures for the conduct of interrogation, testing, and questioning of criminal suspects by officers and agents of the Chicago Police Department. In addition, the City of Chicago promulgated rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects.

262.    These rules, regulations, policies, and procedures were implemented by officers and agents of the Chicago Police Department, including the Police Officer Defendants who were responsible for interrogating suspects and witnesses in connection with the Wicks homicide investigation.

263.    In addition, at all times relevant to the events described in this pleading and for a period of time before those events, Defendant City of Chicago had notice of a widespread practice by officers and agents of the Chicago Police Department under which individuals like Plaintiff who were suspected of criminal activity were routinely coerced against their will to implicate themselves in crimes

of which they were innocent. It was common for suspects interrogated by the Chicago Police Department to falsely confess under extreme duress and after suffering abuse to committing crimes to which they had no connection and for which there was scant evidence to suggest they were involved.

264. Specifically, at all relevant times and for a period of time before the events giving rise to this case, there existed a widespread practice among officers, employees, and agents of the Chicago Police Department under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to the following: (a) individuals, including minors and individuals with mental disabilities and psychiatric conditions, were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (b) individuals were subjected to actual and threatened physical and psychological violence; (c) individuals were interrogated at length without proper protection of their constitutional right to have an attorney present or to remain silent; (d) individuals were forced to sign false statements fabricated by the police; (e) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily or falsely; and (f) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

46

265.   These widespread practices were allowed to flourish because the leaders, supervisors, and policymakers of the Chicago Police Department directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees as to proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses like those that affected Plaintiff.

266.   The above widespread practices were so well-settled as to constitute *de facto* policy of the Chicago Police Department and were able to exist and thrive because policymakers with authority exhibited deliberate indifference to the problem, thereby effectively ratifying it.

267.   In addition, the misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

268.   The policies, practices, and customs set forth above have resulted in numerous well-publicized false confessions, including the false confession at issue here, where individuals were convicted of crimes they did not commit after being subjected to abusive interrogation techniques.

269.   Plaintiff's injuries were caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants

who acted pursuant to the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

270.     The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

### COUNT II – 42 U.S.C. § 1983
### Fabrication of False Witness Statements
### (Fourteenth Amendment)

271.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

272.     In the manner described more fully above, the Police Officer Defendants, Supervisory Defendants (with the exception of Defendant Martin), and the CCSAO Defendants, acting as investigators and without probable cause to suspect Plaintiff of any crime, individually, jointly, and in conspiracy with one another, and others unknown, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and due process by fabricating witness statements implicating Plaintiff in crimes he did not commit, which Defendants knew to be false, and by suppressing their own misconduct and the circumstances in which these witness statements were obtained.

265. Specifically, as set forth above, the Police Officer Defendants used physical violence and psychological abuse to obtain false witness statements from Bell, Ross, and Trice and other witnesses implicating Plaintiff in the Wicks murder.

48

266. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

267. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

268. The misconduct described in this Count by the Police Officer Defendants and Supervisory Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT III – 42 U.S.C. § 1983
### Deprivation of Liberty without Probable Cause
### (Fourth and Fourteenth Amendments)

269. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

270. In the manner described more fully above, the Police Officer Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, used false evidence that they had manufactured in order to accuse Plaintiff of criminal activity and cause the institution and continuation of criminal proceedings against Plaintiff, without probable cause.

271.    In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause, in violation of his rights secured by the Fourth and Fourteenth Amendments.

272.    These Defendants initiated and continued judicial proceedings against Plaintiff maliciously, resulting in injury.

273.    The judicial proceedings against Plaintiff were terminated in his favor when the Cook County State's Attorney dismissed all charges against him.

274.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

275.    As a result of the misconduct of the Defendants described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

276.    The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT IV
### 42 U.S.C. § 1983 – Violation of Due Process under the Fourteenth Amendment

277.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

278.    As described more fully above, Police Officer Defendants and

Supervisory Defendants, while acting individually, jointly, and in conspiracy with each other, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to due process and a fair trial.

279.    In the manner described more fully above, Police Officer Defendants and Supervisory Defendants deliberately withheld exculpatory and impeachment evidence from Plaintiff, his attorneys, and prosecutors, among others, thereby misleading and misdirecting Plaintiff's criminal prosecution.

280.    In addition, as described more fully above, Police Officer Defendants fabricated and solicited false evidence, including statements and testimony they knew to be false, fabricated police reports and other evidence falsely implicating Plaintiff, suborned perjury, obtained Plaintiff's conviction and continued prosecution using that false evidence, and failed to correct fabricated evidence they knew to be false when it was used against Plaintiff during his criminal trial.

281.    In addition, the Police Officer Defendants concealed and fabricated additional evidence that is not yet known to Plaintiff.

282.    Defendants' misconduct directly resulted in Plaintiff's unjust criminal prosecution and wrongful conviction, thereby denying him his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, Plaintiff's prosecution would not and could not have been pursued.

283.    The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and with total disregard for the truth and Plaintiff's clear

51

innocence.

284.    As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

285.    Plaintiff's injuries were caused by the policies, practices, and customs of Defendant City of Chicago in that employees and agents of the City regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating individuals in criminal conduct, elicited false and coerced witness testimony, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a manner similar to that alleged here.

286.    The above-described widespread practices were so well-settled as to constitute *de facto* policy of the City of Chicago and were allowed to exist and flourish because municipal policymakers with authority over the City's policies exhibited deliberate indifference to the problem, thereby effectively ratifying the policy.

287.    The widespread practices described in the preceding paragraphs were allowed to flourish because the City of Chicago declined to implement sufficient training and any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

288.    Indeed, the Chicago Police Department's systems for investigating and disciplining police officers and other employees accused of the type of misconduct that affected Plaintiff was and is, for all practical purposes, nonexistent. The Department maintained a "code of silence" that effectively eliminated any form of accountability, discipline, or oversight.

289.    Chicago police officers and other employees of the City of Chicago who manufactured criminal cases against individuals like Plaintiff had every reason to know not only that they enjoyed *de facto* immunity from criminal prosecution and departmental discipline, but also that they stood to be rewarded for closing cases no matter what the cost. In this way, the City proximately caused abuses like the Police Officer Defendants' misconduct at issue in this case.

290.    The misconduct described in this Count was undertaken pursuant to the policy and practice of the City of Chicago in that the constitutional violations committed against Plaintiff were committed either directly by, or with the knowledge or approval of, people with final policymaking authority for the Chicago Police Department.

291.    The policies, practices, and custom set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNT V – 42 U.S.C. § 1983
### Failure to Intervene

292.    Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

293.    In the manner described above, during the constitutional violations described herein, one or more of the Police Officer Defendants, Supervisory Defendants, and CCSAO Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

294.    As a result of the Defendants' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered pain and injury, as well as emotional distress. These Defendants had ample, reasonable opportunities to prevent this harm but failed to do so.

295.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

296.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

297.    The misconduct described in this Count by the Police Officer Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VIII.

54

## COUNT VI – 42 U.S.C. § 1983
## Conspiracy to Deprive Constitutional Rights

298.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

299.   The Police Officer Defendants and Supervisory Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and thereby to deprive him of his constitutional rights, all as described in the various paragraphs of this Complaint.

300.   In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

301.   In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

302.   The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

303.   As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

304.   The misconduct described in this Count by the Police Officer Defendants and Supervisory Defendants was undertaken pursuant to the policy and practice of the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT VII – 42 U.S.C. § 1983
## Policy and Practice Claim Against the City of Chicago

305.   Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

306.   As described more fully herein, the City of Chicago is liable for the violation of Plaintiff's constitutional rights by virtue of its official policies.

307.   The actions of the Police Officer Defendants and Supervisory Defendants, as alleged above, were done pursuant to one or more interrelated de facto policies, practices and/or customs of the Defendant City of Chicago.

308.   Plaintiff's injuries were caused by the express policies, absence of needed express policies, and widespread practices and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

309.   At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: the conduct of interrogations and questioning of criminal suspects by officers and agents of the Chicago Police Department and the City of Chicago; the collection, documentation, preservation, testing, and disclosure of evidence; writing of police reports and taking of investigative notes; obtaining statements and testimony from

56

witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition to or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to the conduct of interrogations and the techniques to be used when questioning criminal suspects, including juvenile suspects and witnesses.

310. These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago, including the Defendants.

311. In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals suspected of criminal activity, such as Plaintiff, were routinely coerced against their will to involuntarily implicate themselves in crimes that they had not committed. It was common that suspects interrogated in connection with investigations within the jurisdiction of the Chicago Police Department and the City of Chicago falsely confessed, under extreme duress and after suffering abuse, to committing crimes to which they had no connection.

312. Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and

agents of the City of Chicago, under which criminal suspects were coerced to involuntarily implicate themselves by various means, including but not limited to one or more of the following: (1) individuals were subjected to unreasonably long and uninterrupted interrogations, often lasting for many hours and even days; (2) individuals were subjected to actual and threatened physical or psychological violence; (3) individuals were interrogated at length without proper protection of their constitutional right to remain silent; (4) individuals were forced to sign or assent to oral and written statements fabricated by the police; (5) officers and employees were permitted to lead or participate in interrogations without proper training and without knowledge of the safeguards necessary to ensure that individuals were not subjected to abusive conditions and did not confess involuntarily and/or falsely; and (6) supervisors with knowledge of permissible and impermissible interrogation techniques did not properly supervise or discipline police officers and employees such that the coercive interrogations continued unchecked.

313.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of widespread practices by officers and agents of the Chicago Police Department and the City of Chicago, which included one or more of the following: (1) officers did not record investigative information in police reports, did not maintain proper investigative files, and/or did not disclose investigative materials to prosecutors and criminal defendants; (2) officers falsified statements and testimony of witnesses; (3)

officers fabricated police reports and other false evidence implicating criminal defendants in criminal conduct; (4) officers failed to maintain and/or preserve evidence and/or destroyed evidence; and/or (5) pursued wrongful convictions through profoundly flawed investigations.

314.    These widespread practices, individually and/or together, were allowed to flourish because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged and were thereby the moving force behind the very type of misconduct at issue by failing to adequately train, supervise, and control their officers, agents, and employees on proper interrogation techniques and by failing to adequately punish and discipline prior instances of similar misconduct, thus directly encouraging future abuses such as those affecting Plaintiff.

315.    The above widespread practices and customs, so well settled as to constitute de facto policies of the City of Chicago, were able to exist and thrive, individually and/or together, because policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it.

316.    As a result of the policies and practices of the City of Chicago and the Chicago Police Department, numerous individuals have been wrongly convicted of crimes that they did not commit.

317.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of

Chicago or were actually committed by persons with such final policymaking authority.

318.    The pattern and practice of torture and abuse at Area 2 and Area 3, the cover-up of that abuse and the wrongful prosecutions and convictions which resulted therefrom, were well known within Area 2 and Area 3 both well before, during, and after Plaintiff was tortured and wrongfully convicted, including by the command officers at Area 2, which included Defendants Burge and Martin, and Burge's successor, Phil Cline, as well as to former Chicago Mayor Jane Byrne and to Richard Daley (both before and throughout his tenure as Mayor of Chicago) and their Chiefs of Staff, successive Police Superintendents, (including Richard Brzeczek, Fred Rice, Defendant Martin, Matt Rodriguez, Terry Hillard, and Cline), to the successive OPS Directors, including Gayle Shines, and Callie Baird, various Command Personnel, including Deputy Superintendents McCarthy, Lyons, Hoke and Townsend, the Chiefs of Detectives, including William Hanhardt and Hillard, to the Chicago City Council and the Chicago Police Board, and to other policy making, command, and supervisory City and police personnel, who participated in the cover-up and suppression of evidence, the wrongful prosecutions and convictions of the Plaintiff and other torture victims, and the denial of their full and fair access to the courts, inter alia, in the manner set forth in this complaint.

319.    The interrelated pattern and practices of police torture and abuse under Defendant Burge, and the continuing police code of silence, have been repeatedly admitted to, and apologized for, by Chicago Mayors Daley, Emanuel and

Lightfoot, been recognized by the Chicago City Council in its unanimous passing of the 2015 Reparations Resolution and Ordinance, by Defendant Superintendent Martin, and by the Chicago Police Department's Office of Professional Standards.

320.  Additionally, these patterns and practices have also been established by findings of the Cook County Special Prosecutors' Office, by numerous state and federal trial and appellate courts, by the Seventh Circuit Court of Appeals in and in the appeal of Defendant Burge's obstruction of justice conviction, and by several federal court juries.

321.  Additionally, the City of Chicago's said failure to properly train, discipline, monitor, control, assign, transfer, supervise, and counsel Defendants Burge and the Police Officer Defendants, who were involved in numerous other acts of torture and abuse, as well as Defendants Martin and Byrd, was also done with deliberate indifference and likewise acted as a direct and proximate cause of the injuries to Plaintiff.

322.  Additionally, and/or alternatively, the involvement in, and ratification of, the unconstitutional actions set forth above, by Chicago governmental, executive and police policymakers, including, but not limited to, successive Police Superintendents, including Defendants Martin and their direct subordinates, and several Mayors, most notably Mayor Daley, who continued to publicly both ratify, obfuscate and deny his involvement in said conduct until well after he left office in 2011, establish that said constitutional violations were directly and proximately caused by the City of Chicago and its Police Department.

323.    Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

## COUNT VIII
## State Law Claim – Malicious Prosecution

324.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

325.    In the manner described more fully above, all Defendants accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

326.    In so doing, these Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

327.    Plaintiff's criminal prosecution was terminated in his favor, in a manner indicative of innocence.

328.    Defendants' actions were taken under color of law and within the scope of their employment.

329.    As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and

damages as set forth above.

## COUNT IX
## State Law Claim – Intentional Infliction of Emotional Distress

330.   Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

331.   All Defendants' actions, omissions, and conduct, as set forth above, were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or with reckless disregard for the probability that they would cause Plaintiff severe emotional distress, as more fully alleged above.

332.   As a direct and proximate result of the Defendants, Plaintiff suffered and continues to suffer emotional distress and other grievous and continuing injuries and damages as set forth above.

## COUNT X
## State Law Claim – Civil Conspiracy

333.   Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

334.   As described more fully above, the Police Officer Defendants and Supervisory Defendants reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. In addition, these co-conspirators agreed among themselves to protect each other from liability for depriving Plaintiff of these rights.

335.    In furtherance of their conspiracy, each co-conspirator committed overt acts and was otherwise a willful participant in joint activity.

336.    In furtherance of this conspiracy, a tortious action was committed against Plaintiff.

337.    As a result of the Defendants' misconduct described in this Count, Plaintiff suffered damages as set forth above.

## COUNT XI
## State Law Claim – *Respondeat Superior*

338.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

339.    While committing the misconduct alleged in the preceding paragraphs, the Police Officer Defendants and Supervisory Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment.

340.    Defendant City of Chicago is liable as principal for all state law torts committed by its agents.

341.    Defendant County of Cook is liable as principal for all state law torts committed by its agents.

## COUNT XII
## State Law Claim – Indemnification Pursuant to 745 ILCS 10/9-102

342.    Plaintiff incorporates each paragraph of this pleading as if restated fully herein.

343.    Illinois law provides that public entities are directed to pay any tort

judgment for compensatory damages for which employees are liable within the scope of their employment activities.

344.   The Police Officer Defendants and Supervisory Defendants were employees, members, and agents of the City of Chicago, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

345.   The City of Chicago is responsible for paying any judgment entered against the Police Officer Defendants. Plaintiff therefore demands judgment against Defendant City of Chicago in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs, and interest.

346.   Defendant Cook County is responsible for any judgment entered against the CCSAO Defendants.

WHEREFORE, Plaintiff Keith Walker, respectfully requests that this Court enter a judgement in his favor and against Defendants the City of Chicago, Estate of Jon Burge, Daniel McWeeny, John Halloran, Anthony Maslanka, William Moser, Louis Caesar, Susan McCann as Special Representative for John McCann, Thomas Brankin, Robert Lane, Geri Lynn Yanow as Special Representative for  Nicholas Crescenzo, Geri Lynn Yanow as Special Representative for Craig Cegielski, J. Smith, David Golubiak, J. Griffin, John Byrne, Doris Byrd, and Unknown Employees of the City of Chicago, along with Anthony Schumann as Special Representative for Leroy Martin, and Defendant County of Cook along with Defendants Nicholas Ford and Michelle McDowell Simmons, awarding

compensatory damages, attorneys' fees, and costs against each Defendant, and, because they acted willfully, wantonly, and/or maliciously, punitive damages against each of the Individual Defendants, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff Keith Walker hereby demands a trial by jury pursuant to Federal Rules of Civil Procedure 38(b) on all issues so triable.

Dated: September 2, 2022        Respectfully submitted,

KEITH WALKER

By: /s/ Sean Starr
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Steve Art
Sean Starr
Isabella Aguilar
Quinn Rallins
LOEVY & LOEVY
311 N. Aberdeen, 3rd Floor
Chicago, Illinois 60607
(312) 243-5900
sean@loevy.com