# Exhibit A

1

<u>**TRANSCRIBED FROM DIGITAL RECORDING**</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JACQUES RIVERA, )
)
             Plaintiff, )
)
-vs- )  Case No. 12 C 4428
)
)  Chicago, Illinois
REYNALDO GUEVARA, et al., )  March 12, 2013
)  9:43 a.m.
            Defendant. )

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MARY M. ROWLAND, MAGISTRATE JUDGE

APPEARANCES:

For the Plaintiff:    MR. LOCKE E. BOWMAN, III
                     MacArthur Justice Center
                     357 East Chicago Avenue
                     Chicago, IL  60611
                     (312) 503-0844
                     E-mail:  1-bowman@law.northwestern.edu

                     MR. JONATHAN I. LOEVY
                     MR. STEVEN E. ART
                     MR. ANAND SWAMINATHAN
                     Loevy & Loevy
                     312 North May Street
                     Suite 100
                     Chicago, IL  60607
                     (312) 243-5900
                     E-mail: Jon@loevy.com
                             Steve@loevy.com
                             Anand@loevy.com

Transcriber:

          KATHLEEN M. FENNELL, CSR, RPR, RMR, FCRR
                 Official Court Reporter
               United States District Court
         219 South Dearborn Street, Suite 2144-A
               Chicago, Illinois  60604
              Telephone:  (312) 435-5569
      e-mail:  Kathleen_Fennell@ilnd.uscourts.gov

APPEARANCES:   (Continued)

For the individual
Defendants:                MR. JEFFREY NEIL GIVEN
                           The Sotos Law Firm, P.C.
                           550 E. Devon Avenue
                           Suite 150
                           Itasca, IL  60143
                           (630) 735-3300
                           E-mail: Jgiven@jsotoslaw.com

For the Defendant
City:                      MS. EILEEN E. ROSEN
                           Rock Fusco & Connelly, LLC
                           321 North Clark Street
                           Suite 2200
                           Chicago, IL  60610
                           (312) 494-1000
                           E-mail: Erosen@rockfuscoconnelly.com

(Proceedings heard in open court:)

THE CLERK: 12 C 4428, Rivera versus Guevara, et al.

THE COURT: Sorry to keep you guys waiting.

MR. LOEVY: Good morning, your Honor. Jon Loevy for the plaintiff.

THE COURT: Good morning.

MR. BOWMAN: Locke Bowman also here for the plaintiff.

MR. SWAMINATHAN: Anand Swaminathan for the plaintiff.

MR. ART: Steve Art for the plaintiff.

MR. GIVEN: Good morning, your Honor. Jeff Given on behalf of the City.

MS. ROSEN: No.

MR. GIVEN: Oh, sorry.

THE COURT: You're not Mr. Given?

MR. GIVEN: Hard to keep them straight.

In this case, I am on behalf of the individual defendants.

MS. ROSEN: Good morning, your Honor. Eileen Rosen on behalf of the City.

THE COURT: Ms. Rosen, thank you for knowing who's here and why they're here. I need you back in chambers.

(Laughter.)

THE COURT: All right, people. So here's my feeling.

4

Having litigated this, painfully litigated this myself, I don't think that you have standing to challenge this subpoena, okay? So I'm not going to quash the subpoena. However -- and let me just ask you, do you care that it's on videotape?

MS. ROSEN: Not at all.

MR. GIVEN: No.

THE COURT: Okay. And you're paying for the video taping?

MR. BOWMAN: Yes, ma'am.

THE COURT: Okay. So do you need my help in figuring out -- knowing that the subpoena is not going to be quashed, I just don't think you have the ability to ask me to do that, and I don't think I can do that unless the guy who got subpoenaed is in here raising -- raising Cain about it.

Do you need my help in terms of how this is going to go forward?

MS. ROSEN: Apparently.

MR. BOWMAN: Yes.

THE COURT: Okay. Because I know you're all wonderful lawyers and well regarded.

So I'm really torn about it. Tell me about Mr. Lopez. How old is he now?

MR. BOWMAN: He's in his late 30s I believe at this point.

THE COURT: Okay. And is he working?

MS. ROSEN: Yes. Well, at the post-conviction proceeding, he testified that he was working, had a family and --

THE COURT: Okay. So he's busy and he's got a life.

MS. ROSEN: Yes.

THE COURT: Okay. Does he -- who's the lawyer? Because they live in different cities.

MR. GIVEN: She used to be in Cleveland, where Mr. Lopez lives. She then moved to Columbus for her job.

THE COURT: Okay.

MR. GIVEN: And she, I asked her briefly how she came to be Mr. Lopez's lawyer. She said he was a family friend.

THE COURT: Okay.

MR. GIVEN: That's all I know.

THE COURT: I'd really rather get him here for the trial. I mean, I know that I don't have the authority to do that, but that is -- seems way preferable to anything else.

MS. ROSEN: That would be our preference, too, and, quite frankly, I mean, I don't know that the door is closed on that.

THE COURT: Okay.

MS. ROSEN: You know, he came here for the post-conviction hearing.

THE COURT: How did you guys arrange that? I assume the Center For Wrongful Convictions did that.

MR. BOWMAN:  That was -- that was arranged and Mr. Lopez felt very strongly that it was important to come.

THE COURT:  Okay.

MR. BOWMAN:  And he came.

THE COURT:  Okay.

MR. BOWMAN:  My understanding from Ms. Adams is that that was a very painful experience for him --

THE COURT:  Okay.

MR. BOWMAN:  -- and that it's one he does not care to repeat.

THE COURT:  Okay.

MR. BOWMAN:  And that's -- you know, obviously none of us wants to close the door; but I think that we have to face the reality here, which is that at the end of the day, none of us has the ability to compel him to come --

THE COURT:  Uh-huh.

MR. BOWMAN:  -- and I -- I'm not optimistic.

THE COURT:  Uh-huh.

MR. GIVEN:  Judge, if I can just add this.  When I first reached out to Ms. Adams, she expressed that she would fight even a deposition, that her marching orders from Mr. Lopez was to fight the deposition, and, in fact, that's changed.

She has not objected to this deposition.  She accepted service on Mr. Lopez's behalf.  She has not moved to

quash the original subpoena, so there's no way to know what will happen down the road, whether he will or will not come back.

THE COURT: Okay. I -- so I'm inclined to, although this is not really fair to him, but I'm inclined, first of all, to give you more than -- are we on eight-hour rule or seven-hour rule? I should know that.

MS. ROSEN: Seven.

THE COURT: Yeah. So I'm inclined to give you more than that anyway. I mean, nobody's asking for that, but I'm trying to be fair in how we're going to do this dep.

I am concerned that if the jury -- I mean, I'm mostly concerned about the jury, frankly, at this point, and if they've got to watch this thing on video. I was on a jury once, and I had to watch video testimony.

So I would like them to get as much as a coherent story as they can, and I don't -- do you agree that it's your role, and I totally respect that, you know, the accusations here are very serious against your clients so you're going to go to the mat on this -- do you -- I mean, are you sort of cross-examining this guy?

MS. ROSEN: I don't think we are at all, Judge. I mean, he testified in the post-conviction proceeding that he viewed photographs and picked out the person that he thought did the crime through no coercion. He viewed the first lineup

as he describes it and picked out Mr. Rivera.

He then was walking down the street and saw somebody else and it dawned on him at that point that maybe he had the wrong guy. He viewed a second lineup and picked Mr. Rivera again. Had a conversation with a white-haired lady where he tried to say it was wrong, but couldn't identify the woman as a police officer, a lawyer, describes her as carrying a Redweld.

The reference in the courtroom seems to be like he's referring to, like, lawyers, you know, carry Redwelds. He wasn't even sure who it was that he tried to say it was wrong; but in any event, viewed the second lineup. They said to him in response to the wrong comment don't be afraid, we'll protect you, and then he views the lineup again and picks Rivera and then knowingly testifies in court that it was a lie.

He's adamant no police officer coerced him. This is all in the post-conviction. He's adamant that nobody threatened him. They didn't tell him who to pick. You know, from our perspective, you know, we disagree whether or not there was a first lineup or not. We intend to probe that. I don't know that I'd call it a cross-examination. I want more detail about what he's saying. It's not clear. But I don't think we intend -- I mean his testimony is I knowingly lied, okay?

9

Well, I mean, if that's what happened, then that's what happened, and I don't think we're going to say no you didn't.

THE COURT: Who put him on in the post-conviction?

MR. LOEVY: We did.

MR. BOWMAN: And, your Honor, he's our witness.

MR. GIVEN: And, your Honor, let me also just add with regard to the cross-examination question, which I would not characterize what we intend to do as cross-examining him at all.

Mr. -- from what we know, Mr. Lopez was first contacted by a representative of Northwestern in February of 2010, I believe. Then from 2 --

THE COURT: Does that all come in? Kind of how he became a witness who recanted? Is that part of the trial in this case?

MR. BOWMAN: Well, you know, there -- in our experience, there have been in the past occasions where that's been an issue. You know, whether it becomes an issue --

THE COURT: You mean made an issue by the defendants, or it's an issue that you want to put out there?

MR. BOWMAN: It's not -- it may -- you know, I don't know how this is going to play out, your Honor. It may be important for us to tell that piece as part of what we would see as our presentation of this witness who is most definitely

our witness.

THE COURT: Yeah.

MR. BOWMAN: This guy is very clear that he recanted his -- I mean, there is some murkiness about the lineups and the photo arrays and so forth and so on, and each side has its views on that. Our view is that he supports our position that there was a fabrication here and a concealment of a lineup. But putting that aside --

THE COURT: Yes.

MR. BOWMAN: -- and just focusing on what's undeniable, he tells the white-haired lady and a mustached police officer, who, you know, Guevara has a mustache, that his identification of our client was wrong. He tells them that undeniably, and that --

THE COURT: And that's in the post-conviction.

MR. BOWMAN: -- fact is not revealed, and all of this is testified about at the post-conviction.

MR. GIVEN: Judge, may I, please?

THE COURT: You may.

MR. GIVEN: Number one, what he just told you is not true. Mr. Lopez did not say he also told the mustachioed man. He said I told the silver-haired lady, and then I saw her go off and talk to somebody, and I don't know what they talked about.

But more importantly to the point of this

cross-examination and the nature of the background of our desire to question Mr. Lopez.

So they find him in February of 2010. From February of 2010 through June of 2010, we don't know how many times they get together and talk with him, but we do know in June of 2010 they come up with an affidavit that they used in the post-conviction. Mr. Lopez signs an affidavit that is part of the post-conviction proceedings.

Then we don't know how many times they talked to Mr. Lopez from the point of the affidavit to the point in time when they fly him out for the post-conviction hearing --

THE COURT: Right.

MR. GIVEN: -- which they put him on. They had an opportunity to examine him for whatever amount of time that they want, under oath, and they do that.

We, on the other hand, win. So now this case comes up. I reach out -- I'm told that Mr. Lopez is represented by counsel, so -- and they gave me the wrong contact information, but I find her anyway.

So I talk to her and I ask can we have a chance just to talk to Mr. Lopez? She says absolutely not. He's tired of everything.

I said, well, my client never had a chance to talk to him, formally or informally. She says, well, I won't agree to an in -- I said, okay, fine. I'd like to then work on taking

his deposition.

She said, well, I'm going to fight your deposition.

I said, well, I hope that doesn't come to that, but I'm going to try to cooperate with you. We'll take his -- where would you like his deposition? Would you like it in Columbus? Would you like it in Cleveland? She tells me in Cleveland.

THE COURT: Right.

MR. GIVEN: I issue the subpoena and, by the way, this notion that there was a manic race is just absurd; and by the way, once I did serve the subpoena in January, it wasn't until last week that they came out with this, oh, well, we need to depose him first. It was always can you give me a date that works for you? And they said, sure, we'll get back to you and never did.

So when you talk about cross-examining, the truth is I want to interview this man because I don't know so many things about what he has done, what he said, at the different times that he said it. I don't know about his interactions with the plaintiffs, now plaintiffs in the case, so I don't view it as a cross-examination at all, and he's as important to our case as he is to theirs.

MR. BOWMAN: But, but, your Honor, he is -- he is going to be called. If he is available, if he will come, he is going to be called in our case. We are the plaintiff. We

have the burden of proof.

THE COURT: Yeah, I know about the burden. I'm concerned about the burden. What do you want to say?

MS. ROSEN: The only thing I want to add, Judge, is, you know, Mr. Given raised the point this subpoena was issued and served in January, and we were -- the date that we selected was inconvenient for Mr. Lopez. We reached out to plaintiff's counsel and asked them to provide us a date.

They did not say at that time no, he's our witness. We think we should go first. None of that conversation was had. We repeatedly asked for dates, and it wasn't until last week, now six weeks or eight weeks later, that this issue comes up.

You know, the rules, we noticed him, we subpoenaed him. I've never had a scenario where, you know, a couple months after a subpoena gets served, the other side says, well, it's our witness and we get to go first.

THE COURT: Yeah.

MS. ROSEN: Now, I appreciate that, you know, there's a possibility that he's not going to come to trial and there's the concern about how the evidence gets presented; but in federal court, we don't have evidence depositions. They're all for one. We read deposition transcripts in all the time. We make video presentations all the time. Nobody wants it to be disjointed.

Like Mr. Givens said, we're not interested in cross-examining him. We want his story, and we don't have his story in full.

THE COURT: Okay. Here's what I'm going to do. I really appreciate what you're saying, if I thought this man was going to come to testify, I wouldn't -- I would have no -- there would be no issue here, okay? You would get to do your job.

You noticed it up. It is kind of a first come, first serve in this world, but I am really concerned that they have the burden, okay, and he is going to be probably the most important witness in the case.

I mean, you guys all have dogs in the fight, and so your -- your client and your clients, whoever the jury likes and believes is going to be obviously very significant; but this is the only third-party person who's going to come in and say anything.

I appreciate your presentation, Mr. Given, but when I hear you talking, I hear you wanting to -- I know you don't want to go after Mr. Lopez, I mean, I'm sure you're going to treat him with all respect, but I do hear you wanting to cast some suspicion on how they found him in February and then somehow they came up with an affidavit --

MR. GIVEN: Judge, that's not true at all.

THE COURT: -- in June.

MR. GIVEN:  That is not true at all.

THE COURT:  So let me just -- so I'm going to do this.  I'm going to allow you to present him as your witness, okay?  I'm going to allow you to go first, but they get every opportunity to have him as a witness at trial.

I mean, I can't -- I'm not -- you don't get six-and-a-half hours and then get 45 minutes at the end. That's not happening.

So I would be -- you know, I would like to split it pretty even.  I would like it to be five and five.  That's really arduous for the witness.  And I'm sure this Ms. Whatever her name is is going to have a fit, and she has every right to.  I'd rather keep it four and four.

MR. BOWMAN:  We can live with three-and-a-half and three-and-a-half, Judge.

THE COURT:  Can you live with three-and-a-half and three-and-a-half?  Because I don't want to draw a motion to quash from her, but I want you guys to each have your opportunity.  You absolutely have a right to that, and I hope that you can let them lay out that story and then you can go in and fill in those holes.

MS. ROSEN:  Well, your Honor, can I interrupt for just a second?

THE COURT:  Yes.

MS. ROSEN:  If the basis of your ruling is because

this is going to be trial presentation, then their questioning has to be direct questions. They can't lead him through the story because they wouldn't be allowed to lead him through the story in front of a jury.

THE COURT: Well, do you -- I mean, aren't we in a situation where this has to be trial testimony? I mean, I'm not ruling that it's trial testimony, but I'm being told that this is it. This guy doesn't want to cooperate, and we -- he's going to have to be in the courtroom somehow.

MS. ROSEN: Well, I don't know that that's -- I don't know that -- A, I don't know that that's definitive that he's not coming.

THE COURT: Okay.

MS. ROSEN: But if the premise of your ruling is you're concerned that he's not coming and that the jury needs to hear a coherent story, then this deposition has to be taken that way, and they should not be allowed to lead him through it. Then they should ask like --

THE COURT: Do you hear her?

MS. ROSEN: -- a trial presentation.

MR. LOEVY: We are aware of the rules of evidence. You know, there are rules governing depositions. There are rules governing testimony, and we will certainly do it in a way that we believe will be admissible at trial.

MR. GIVEN: Which doesn't answer the question, Judge.

In fact, they cite Judge Kendall, which was a somewhat inapposite situation, but Judge Kendall even told them in the case that they cited in their brief that they could not ask leading questions. Very simple, no leading questions, not what Mr. Loevy said.

THE COURT: Wait, I thought they cited Judge Valdez?

MR. BOWMAN: Yeah, and she said no such thing.

MR. GIVEN: Okay. Well, in fact, then let me go back because this -- this notion of this race, our respective offices, this is now the --

THE COURT: I don't care about -- I don't care about the race, Mr. Given. I mean, I really -- I appreciate that you guys are really passionate about this case. I'm just trying to treat Mr. Lopez with respect and also preserve the testimony for a jury that's going to have a really hotly contested dispute to resolve, okay?

So I just want to be, you know, one of the reasons I got out of litigating myself is because I got sick of that kind of stuff, so I'm really -- I don't need to hear anything more about it.

MR. GIVEN: Okay.

THE COURT: I want you all to kind of inject a little more professionalism back into your communications just because I can tell things are getting very hot, and that's okay, but it's not -- none of that is going to make any

difference to me, okay? I just want this testimony to come out in as coherent a fashion as it can come out for the jury, for both of your people, for both of your clients.

Go ahead. I know you want to say something.

MS. ROSEN: I just want to be clear on whether or not they -- it's clear to them that they have to elicit the testimony in the way that they would be required to elicit the testimony in court.

THE COURT: Well, I will tell you if you come in with a video where that isn't happening, you're not going to get to introduce it, so, I mean, you live with your -- you know, make your bed and you lay in it. And I don't know who's the judge? Gottschall?

I mean, she's not going to let you bring in a story that's leading. She's just not going to let you do that. She's a very experienced trial judge. So you'd be stupid to do that, but take that at your own risk.

MR. LOEVY: Exactly.

THE COURT: So here's the order: I'm going to allow the plaintiff's counsel to go first. I'm going to limit him to half of the time, okay? Him or her. We seem to be hims.

If you -- if the witness agrees to eight hours and you go four and four, that's fine. If the witness won't agree and you go seven hours, I mean it's three-and-a-half and three-and-a-half, whatever it is. You get half the time, and

you get half the time, okay?

If you can get him to ten hours, that's fine with me, I mean, but that's got to be fine with him obviously.

Do you need anything else?

Mr. Given, do you want to say anything?  Because you look really irritated.

MR. GIVEN:  No, I'm -- I'm curious -- the problem is this is an ongoing thing between our offices, not just in this case -- and by the way, your Honor, I think we've been very professional in dealing with our disagreements on this.

One of my frustrations is throughout over the course of three or four different cases now, the plaintiffs' lawyers keep telling us, well, it's not notice of deposition that counts, it's service of deposition, and the subpoena.

So we serve a subpoena, and then they say, well, no, that actually it doesn't count either, so what I was -- what I was ultimately going for was thinking about asking your Honor --

THE COURT:  Yeah.

MR. GIVEN:  -- was in moving forward in this case and other cases, I'm struggling to know now what defines when it's my dep versus their dep?  Do I have to call them up and say, by the way, I'm thinking of issuing a subpoena for a witness but I want to know if you think it's your witness or he's more your witness than my witness?

Because honestly, Judge, there's a lot Mr. Lopez says I actually would like to see bolstered. The fact that he says in the PC that officers did not coerce him, force him, suggest to him or anything else, that's very helpful for us.

THE COURT: Yeah, of course.

MR. GIVEN: So I don't want to attack him at all. I want him to tell his story again truthfully and so this -- I don't know going forward how, in light of today, what I'm supposed to do in issuing subpoenas anymore and whose dep --

THE COURT: Well, I think --

MR. LOEVY: Can I speak?

THE COURT: Of course, there's nothing -- I'm going to let you speak in a minute. There's nothing I can say about your other cases, obviously.

I will tell you I think this is a very peculiar or unique set of circumstances, okay? I mean generally witnesses are pretty clearly defined whose side of the aisle they're sitting on, so I hope this particular issue isn't coming up in all five of your cases or four of your cases.

It's not up to Mr. Loevy, I mean, whatever he says about, well, the deposition, the notice rules or the subpoena rules, really not his decision, so I wouldn't -- I wouldn't give that much weight.

I think we have a particular circumstance, and I'm telling you if I thought this was a witness who was just

coming here, you know, and you guys were doing pretrial prep, dep, you know, discovery kind of thing, I would not be ruling this way, okay?

But I think this is significant because you have very strong message from the counsel that this guy wants to be done with this, and he does not want to be bothered with this and we, as a court, don't have power to drag him here. Much my preference to drag him here if I could.

So I hope that this ruling doesn't impact any of your other interactions in other cases. I think it's a pretty narrow set of circumstances.

Mr. Loevy, do you want to say something?

MR. LOEVY: Only if Mr. Given would like to talk about other cases, you know, we have a different view on what he's saying.

THE COURT: No, I don't want to hear about other cases.

MR. LOEVY: All right.

THE COURT: I mean, that's just not -- I don't need to hear that.

Okay. I'm kind of hoping that the thing we talked about last time got worked out.

MS. ROSEN: It's in the process, Judge.

THE COURT: Okay.

MS. ROSEN: There is -- I've gone back to my client,

and the only way to determine what lineup reports were prepared at any point in time prior to 1996 or so, it requires a manual hand search through all of those files because none of it's put on computer --

THE COURT: Yeah, of course.

MS. ROSEN: -- until '96 or so.

So we had discussions about that. That was my suspicion. It's now been pretty much confirmed that that's the case.

We had discussions last week about it. In those discussions when we talked about the universe of files that we were going to pull to look at, plaintiff said that whatever universe we agreed to, whether it be by category or time, that that would be it. So if we agreed to, say, a two-year period of time, we find, you know, one report or none report or ten reports, that's it, defendants couldn't go beyond that because that was the agreement that we reached, and we'd all have to live with what we found.

Based on that representation, I have done a little more investigating into this issue sort of more globally to try and ascertain what information is out there about the percentages that occur in research about filler identifications to try and figure out what's a fair --

THE COURT: Sample.

MS. ROSEN: -- sample.

Now, there is this issue, though, Judge.  Originally, right, we came here on our motion for protective order to --

THE COURT:  Yes.

MS. ROSEN:  -- to strike the requests to admit, and then there was some interrogatories propounded on the topic of production, and the way that that was all styled at that time was produce any report within the 20 years of 1988.

Now through discussions that we've been having so that I can figure out what we'd be willing to agree to, even if we were to find a report where a filler was identified, now I'm being told, well, we take the position that there should have been more, so one is not enough.

And we'd be free to argue in that scenario that, you know, if you do a hundred lineups, we expect that 10 percent should be filler identification, so if you don't come up with 10 percent, then we're going to argue there's a flaw in your practice.

If that's where we're going, and that's not how I understood the discovery on the front end, but if that's where we're going, then that sort of changes what I'm willing to agree to because that's a different kind of inquiry.

THE COURT:  Okay.  I'm regretting I asked, but go ahead.

MR. LOEVY:  Thank you, your Honor.

From plaintiff's perspective, it's obviously a very

important issue in the case. The issue that you identified with Mr. Lopez was whether there was a first lineup where he picked the wrong guy. We believe what the evidence is going to show is when they did lineups and the suspect picked the wrong guy, they didn't document it.

THE COURT: I know your theory.

MR. LOEVY: So what we intend to do is take a sample of a time period, and we're frankly prepared to do out toward infinity at our expense. For example, if this happened in 1988, we proposed to them how about if we look at '88, '87 and '86.

There's only 5 to 800 murders in any given year, so it's a finite amount of data. It would take, you know, days, but probably not weeks, to review those murder files.

THE COURT: They have law students, you know.

MR. LOEVY: Exactly. We've got an army of assistants. But in a matter of days, but not weeks, we could review a given year and say you know what? Was it 800 murders? A quarter--

THE COURT: Well, this seems like a trial issue. I mean, you're going to have what you have, right? And they're going to argue to the jury this is ridiculous. You know, they should have had more filler IDs than they have.

And you're going to argue to the jury no, this is the national average or whatever evidence you're going to present.

I don't know that this is a discovery issue.

MS. ROSEN: No, but it dictates this notion of, you know, how far we look, right? Because there's going to be -- if it's 800 homicides in a year, not all 800 have lineups, so --

THE COURT: Right.

MS. ROSEN: Let's say you only have -- out of that 800, you only have 400 lineups.

THE COURT: But that's all coming in. We looked at 400 files.

MS. ROSEN: Right, but on any given year, like in year 1988, you can have two filler reports, let's say. In 1987, you can have 20. In 1986, you could have ten.

If they're going to take the position that the percentage should be higher, then just the averages dictate to me how far I need to look. That's the question.

The question is how far do I need to look? And I'm not prepared, as we stand here today, to say I'm going to agree to two years without knowing more about what the rates are and the variables. That's all I'm saying.

MR. LOEVY: And here's our point. In response, though, we should agree before we start doing the investigation. Let's say we've started with a two-year period and it broke our way.

Let's say in that two-year period there was two

fillers, and we have social science that says, hey, they should do fillers at almost the same rate as they do real ones. And the defendants say, well, boy, this one didn't play well for us, let's go back two more years. And that one doesn't play well for them. And then they, say you know what? We want to keep going. Oh, five years ago, there was a whole bunch of fillers. Now we like that universe.

We want to avoid that scenario. We are willing to be flexible about the time period chosen as long as it's done blind. We want it to be -- them to have a unilateral option to say, boy, we'd like them to roll the dice again, so --

THE COURT: Well, I feel like you're getting a lot because you're getting to dig into these files, okay? I'll just tell you, even though I'm not supposed to give advisory opinions, and I'm probably way out of my -- but if they come back to me and say we, the City, want to go through another hundred files, am I really going to not let them do that? No, I'm not.

MR. LOEVY: Can we have the right?

THE COURT: I mean, I'm just warning you that if you guys agree to two years, which, I don't know, seems sensible or you agree to three years and they come back -- they're fighting the burden of it -- they come back and say, gee, we want to take on more burden and look at two more years --

MR. LOEVY: What if they said --

27

THE COURT: -- does it sound like I'm going to say no, you can't do that? It's their files.

MR. LOEVY: What if they didn't even ask you, your Honor? What if they said the two years broke reasonably well our year -- our way. They're going to unilaterally look at two years before that, decide whether they want to disclose it or not and say you know what? This makes our hand better. Plaintiffs, we'll disclose it. If it makes their hand worse, they don't disclose it.

THE COURT: Well, I don't -- I'm not worried about -- if they do that, then I'm going to be mad.

MR. LOEVY: All right.

THE COURT: But I don't think they're going to do that. I think they're going to talk to you and try to work out an agreement, and they need your law students.

MR. LOEVY: Well --

THE COURT: She's not spending whatever she's paid an hour looking through these files, so I'm not worried about that, but I'm not going to say -- you're not even asking me to rule, so I should shut my mouth, but I don't feel like you guys agreed to two rules and that's it, set in stone from now to eternity.

If they want to go further, going further is a benefit to them, I mean, it may be. It may not be. Going for them might hurt them more, but if they want to go further,

it's their files.

MR. LOEVY: Can we go further if we don't like the two years?

MS. ROSEN: No one's -- let me just be clear right now. We haven't agreed -- I haven't agreed to anything.

THE COURT: Yeah, I understand.

MS. ROSEN: So, you know, but we're just trying to get all the ground rules here because they --

THE COURT: I mean, it's their burden objection. So when you say to me can we go further, that's a different equation.

MR. BOWMAN: Well, Judge, I think the principal concern is that there be transparency.

THE COURT: Of course.

MR. BOWMAN: And if there -- if they decide to go look at, you know, a hundred more files, we want to know up front that that decision --

THE COURT: That seems fair to me.

MR. BOWMAN: -- actually been made.

MR. LOEVY: That's what I'm saying to me.

MS. ROSEN: Your Honor, I've never said that I would go looking at files -- I don't even -- I mean, as we sit here now, we're going to have to come up with a list of all the homicide files --

THE COURT: Yeah.

MS. ROSEN: -- in a given year. They're going to know what files there are.

THE COURT: Well, that seems fair to me. So if you guys agree to two years or three years or whatever it is and you're not happy with the results, whatever side, you know, you're going to talk about that. You're not going to go behind closed doors and look at another year and then pop up and say, oh, by the way, we did another year.

But I'm not going to bind them to whatever they agreed to out of the box, but there should be transparency in the process. But they're going to need your help anyways. They're not -- they don't have the person power to go and do that without you, I would think.

Okay. I'm not going to ask any more. Good-bye.

Should I set a status, or will you just notice up a motion?

MR. BOWMAN: We'll find our way back.

THE COURT: Okay. I'll see you.

MR. LOEVY: Thank you.

THE COURT: See you in the spring. Good luck.

(Which were all the proceedings heard.)

CERTIFICATE

I certify that the foregoing is a correct transcript from the digital recording of proceedings in the above-entitled matter to the best of my ability, given the limitations of using a digital-recording system.

*/s/Kathleen M. Fennell*                    *April 12, 2013*
_____          _____
Kathleen M. Fennell                              Date
Official Court Reporter